# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-cv-60762-ALTMAN

**WINSTON CALDER**,

*Petitioner,*

*v.*

**RICKY D. DIXON, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS**,

*Respondent.*

_____/

## ORDER

Our Petitioner, Winston Calder, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state-court conviction and life sentence for the first-degree murder of his ex-girlfriend. *See* Petition [ECF No. 1] at 1–2. The State says that Calder's "claims are all either affirmatively contradicted by the existing record or patently frivolous[.]" Response in Opposition to Petition for Writ of Habeas Corpus ("Response") [ECF No. 10] at 61. We agree and now **DENY** the Petition.

### THE FACTS

On February 6, 2008, a grand jury in Broward County, Florida, charged Calder (by indictment) with one crime: the first-degree murder (with a firearm) of his ex-girlfriend, Georgia Lee. *See* Indictment [ECF No. 11-1] at 20. The State alleged that "during an argument in which his girlfriend, Georgia Lee, tried to remove him from their apartment, Calder shot and killed Lee." *Calder v. State*, 133 So. 3d 1025, 1027 (Fla. 4th DCA 2014). During Calder's first trial, the State introduced a statement Calder made to law enforcement on January 21, 2008 (the "January 21, 2008 Statement"), in which "Calder confessed to firing the fatal shot that killed Lee." *Id.* at 1029. Although Calder's first trial ended with a guilty verdict, the Fourth DCA reversed and remanded for a new trial after concluding

that the January 21, 2008 Statement should have been suppressed because it was obtained in violation of Calder's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See id.* at 1033 ("Here, the totality of the circumstances shows that Calder's reinitiation of the interrogation and waiver of his previously invoked right to counsel were not voluntary, but instead, the product of improper police conduct.").

Calder chose to testify in his own defense at his second trial. *See generally* Trial Tr. [ECF No. 13-1] at 1130–1307. On cross-examination, the State impeached Calder with the January 21, 2008 Statement. *See, e.g., id.* at 1253–54 ("[Calder]: No. The door was already open, I was not forcing the door. The door was already open. [The Prosecutor]: Do you recall giving a different answer than that, Mr. Calder, back on January 21, 2008? . . . Q: Would you agree with me, Mr. Calder, the question [on January 21, 2008] was, 'You were trying to force it open?' And your answer was, 'Yeah.' 'And then they were kicking at you?'"). For the second time, a jury convicted Calder of first-degree murder. *See* Verdict [ECF No. 11-2] at 100. The trial court sentenced Calder to life in prison on February 17, 2015. *See* Judgment and Sentencing Orders [ECF No. 11-2] at 105–110.

Ten days later, Calder moved for a new trial under FLA. R. CRIM. P. 3.600. *See* Motion for New Trial [ECF No. 11-2] at 112. In that motion, Calder's lawyer argued that the trial court had "erred in allowing the state to argue in closing [that] the Defendant's [January 21, 2008] statement [was] substantive evidence when it was not admitted into evidence." *Ibid.* The trial court denied Calder's motion after a brief hearing, concluding that, "even though the State couldn't get the statement in their case in chief, it certainly was fair game for cross-examination. And that's exactly what the State did in this case." Motion for New Trial Hr'g Tr. [ECF No. 13-2] at 8.

Calder appealed his conviction and sentence to the Fourth DCA. *See* Direct Appeal Notice of Appeal [ECF No. 11-2] at 117. In that appeal, Calder's lawyer advanced only one argument: that the trial court had "erred reversibly in admitting excessively gruesome photographs depicting the deceased after her body had been moved from against the front door and placed face up on the floor." Direct

Appeal Initial Brief [ECF No. 11-2] at 195. The Fourth DCA summarily affirmed Calder's conviction in an unwritten opinion on March 16, 2017. *See Calder v. State*, 224 So. 3d 232, 232 (Fla. 4th DCA 2017). Calder, now proceeding *pro se*, filed a motion for rehearing, *see* Motion for Rehearing [ECF No. 11-2] at 218–20, which the Fourth DCA denied on April 24, 2017, *see* Order Denying Motion for Rehearing [ECF No. 11-2] at 225.

On April 17, 2017,[1] Calder filed a petition for a writ of habeas corpus in the Fourth DCA, alleging that his appellate counsel had been ineffective. *See* State Habeas Petition [ECF No. 11-2] at 227–42; *see also* FLA. R. APP. P. 9.141(d)(3) ("Petitions alleging ineffective assistance of appellate counsel must be filed in the court to which the appeal was taken."). Calder argued that his appellate lawyer had erred by failing to "raise on direct appeal the issues of the trial court erring in allowing the State to argue in closing the Petitioner's statement as substantive evidence when it was not admitted into evidence, and when no hearing was held on the issue of voluntariness before allowing prosecutor to use statement for impeachment." State Habeas Petition [ECF No. 11-2] at 230 (errors in original). On July 10, 2017, the Fourth DCA summarily denied Calder's state habeas petition in a one-sentence order. *See* Order Denying State Habeas Petition [ECF No. 11-3] at 208 ("ORDERED that the May 1, 2017 petition for ineffective assistance of counsel is denied.").

Five days before that ruling came down (on June 5, 2017), Calder filed in the state trial court a motion for postconviction relief under FLA. R. CRIM. P. 3.850. *See* Postconviction Motion [ECF No. 11-3] at 9–54. Calder amended that Postconviction Motion on October 16, 2017. *See* Amended Postconviction Motion [ECF No. 11-3] at 220–65. The Amended Postconviction Motion advanced eight grounds for relief: (1) that "defense counsel was ineffective for failing to hire a ballistics and

---

[1] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

blood spatter expert," *id.* at 223; (2) that counsel was ineffective "for failing to request a hearing on the issue of voluntariness of the Defendant's January 21, 2008 statement, prior to the State Attorney using the statement for impeachment purposes," *id.* at 231; (3) that counsel was ineffective "for failing to discover that the January 21, 2008 statement had been tampered with by agents of the State of Florida," *id.* at 235; (4) that counsel was ineffective "for failing to impeach State witness Michael Green with his prior inconsistent statements that he gave in his deposition and in his prior trial testimony," *id.* at 240; (5) that counsel was ineffective for failing to "object to the prosecutorial misconduct during closing arguments," *id.* at 250; (6) that defense counsel "was ineffective for [failing] to object and notify the trial court that a juror was sleeping throughout critical trial testimony," *id.* at 257; (7) that counsel was ineffective for failing to argue "in closing arguments that [Patrick Johnson] testified that he witnessed the defendant go leave the bag at the truck and seen [sic] the defendant return right back to the house," *id.* at 259; and (8) that counsel was ineffective for failing to "introduce evidence of [the victim's] prior arrest record of domestic violence," *id.* at 262. The State filed a voluminous Response to the Amended Postconviction Motion—it included over 1,800 pages of argument and exhibits— contending that all eight of Calder's claims were meritless. *See* State's Postconviction Response [ECF No. 12-1] at 23.

On March 29, 2022, the state postconviction court denied the Amended Postconviction Motion "[f]or the reasons articulated in the State's response." Order Denying Amended Postconviction Motion [ECF No. 12-7] at 56. Calder appealed this denial to the Fourth DCA, *see* Postconviction Notice of Appeal [ECF No. 12-7] at 58, contending that the state postconviction court had erred in denying all eight grounds for relief, *see* Postconviction Initial Brief [ECF No. 12-7] at 63– 87. But the Fourth DCA summarily affirmed, *see Calder v. State*, 350 So. 3d 347, 347 (Fla. 4th DCA 2022), and its mandate issued on December 23, 2022, *see* Postconviction Mandate [ECF No. 12-7] at 97. The Fourth DCA also denied Calder's motion for rehearing and for a written opinion, *see* Motion

for Rehearing [ECF No. 12-7] at 91–92; Order Denying Motion for Rehearing [ECF No. 12-7] at 95. Calder filed this Petition on April 17, 2023. *See* Petition at 24.

**THE LAW**

**I.      The Antiterrorism and Effective Death Penalty Act ("AEDPA")**

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)). "[E]ven if a petitioner successfully carries his burden under § 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under § 2254(d)(2): Even if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc) (quoting 28 U.S.C. § 2254(d)(2)). Indeed, habeas relief is not warranted "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as

6

a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Ibid.* (cleaned up).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 1524 (emphasis in original); *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

## II.     AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the State may express its intent to "waive the limitations bar").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (emphasis in original). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present his claim to the state court—by exhausting his claim[ ] and complying with the applicable state procedure—prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Ibid.* In other words, where a petitioner has not "*properly* presented

his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848.

There are, to be sure, two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."). A habeas petitioner can establish "cause and prejudice" if (1) "some objective factor external to the defense impeded the effort to raise the claim properly in the state court," and (2) "there is at least a reasonable probability that the result of the proceeding would have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017). "Actual innocence," on the other hand, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of establishing that one of these exceptions to the procedural-default rule applies. *See Gordon v. Nagle*, 2 F.3d 385, 388 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice."); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim with new reliable evidence[.]" (cleaned up)).

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

### III.     Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). This same standard applies to alleged errors made by both trial counsel and appellate counsel. *See Farina v. Sec'y, Fla. Dep't of Corr.*, 536 F. App'x 966, 979 (11th Cir. 2013) ("A claim of ineffective assistance of appellate counsel is evaluated under the same standard as for trial counsel.").

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel could not have performed deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, a defendant must

show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

**ANALYSIS**

In this Petition, Calder asserts the same eight ineffective-assistance-of-counsel claims he originally advanced in his Amended Postconviction Motion in state court. To recap, those eight grounds for relief allege that his trial lawyer was ineffective for: (1) "failing to hire a ballistics and blood splatter expert," Petition at 4; (2) "failing to request a hearing on the issue of voluntariness of the Defendant's January 21, 2008 statement," *id.* at 7; (3) "failing to [d]iscover that the January 21, 2008 statement had been tampered with by agents of the State of Florida," *id.* at 8; (4) "failing to impeach State witness Michael Green with his prior inconsistent statements," *id.* at 11; (5) "failing to contemporaneously object to prosecutorial misconduct during closing arguments," *id.* at 15; (6) "fail[ing] to object and notify the trial court that a juror was sleeping throughout critical trial testimony," *id.* at 17; (7) "failing to argue in closing argument that State witness Patrick Johnson testified that he witnessed the Defendant go leave the bag at the truck and seen [sic] the Defendant return right back to the house," *id.* at 18; and (8) "failing to introduce evidence of Georgia Lee's prior arrest record of [d]omestic violence," *id.* at 21.

The State concedes *both* that the Petition is timely, *see* Response at 18 ("[I]t appears that Petitioner's petition is timely filed."), *and* that Calder properly exhausted all eight of his claims, *see id.* at 20 ("Exhaustion and procedural default do not seem to be applicable to any of Petitioner's claims of ineffective assistance of trial counsel."). We'll therefore review all eight "claim[s] that [were] adjudicated on the merits in State court proceedings" to determine whether the state court's decisions "involved an unreasonable application of clearly established federal law" *or* "[were] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). In assessing the "reasonableness" of these decisions, we look

to the "highest state court" that reached the merits of Calder's claims. *Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008). But neither the Fourth DCA nor the state postconviction court "explain[ed] its decision on the merits in a reasoned opinion." *Wilson*, 138 S. Ct. at 1192. The state postconviction court denied the Amended Postconviction Motion "[f]or the reasons articulated in the State's response," Order Denying Amended Postconviction Motion [ECF No. 12-7] at 56, and the Fourth DCA summarily affirmed in an unwritten opinion, *see Calder*, 350 So. 3d at 347. We'll thus presume that these courts applied the reasoning of the State's Postconviction Response. *Wilson*, 138 S. Ct. at 1192 ("[T]he federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale."); *see also, e.g.*, *Pierre v. Dixon*, 2022 WL 3549781, at *7 (S.D. Fla. Aug. 18, 2022) (Altman, J.) ("And, because the state postconviction court simply 'adopted the reasoning as set forth in the response of the State,' we presume that the Fourth DCA applied the reasoning in the State's Postconviction Response when it denied Pierre's trial-counsel claims." (cleaned up)).

## I.      Ground One

In Ground One, Calder contends that his defense lawyer should have hired "a ballistics and blood splatter expert to testify" at his trial. Petition at 4. As Calder explains, his theory of defense was that he shot the victim in self-defense during a struggle with the victim *and* two other people who were inside the apartment at the time. *See ibid.* ("At trial, the Defendant testified that . . . there was a struggle, and that while Michael Green was attacking him from the front, Patrick Johnson was attacking him from behind, and would not allow him to leave."). The State, Calder claims, attacked this theory by arguing that the position of the victim's body was inconsistent with Calder's self-defense claim. *See id.* at 5 ("The prosecutor asked: 'Okay. So Mr. Calder, how is it, [if] she's facing the door pushing it, and she's facing you, how does the bullet go into the [right] side of her head?'" (quoting Trial Tr. [ECF No. 13-1] at 1207)). Calder now insists that, had his lawyer called ballistics and blood-spatter experts

at trial, they would have testified that "the decedent's body had been moved by the police," which would've prevented the State from arguing that the position of the victim's body was inconsistent with Calder's theory. *Id.* at 4.

The State offers five responses to this claim. *First*, Calder (it notes) told the trial court that "his attorneys had called all of the witnesses that he wanted to have called." Response at 30. *Second*, Calder is (the State says) simply speculating that an expert "would have actually testified to the theories espoused by Petitioner." *Id.* at 31. *Third*, the evidence at trial (the State maintains) refutes Calder's view that "the decedent's body had been moved by the police[.]" *Id.* at 33. *Fourth*, the State continues, counsel's decision *not* to call these experts was a reasonable trial strategy because it allowed counsel to "exploit[ ] the conflict in the eyewitness testimony . . . . [and] to argue to the jury at closing that the State failed to prove beyond a reasonable doubt that Petitioner did not act in self-defense." *Id.* at 33–34. *Fifth*, the State contends that Calder wasn't prejudiced by counsel's failure to call these experts because the prosecution presented "overwhelming and uncontroverted evidence" of his guilt. *Id.* at 34. Because we agree with the State's third and fourth arguments, we don't reach the other three.

A lawyer has "no absolute duty to investigate particular facts or a certain line of defense, although a complete failure to investigate may constitute deficient performance of counsel in certain circumstances." *Fugate v. Head*, 261 F.3d 1206, 1217 (11th Cir. 2001). The failure to call an expert witness thus doesn't constitute ineffective assistance unless the decision "was so patently unreasonable that no competent attorney would have chosen it." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (cleaned up). To overcome this presumption of reasonableness, Calder must show that any "competent attorney" would have called these experts at trial. *See Devier v. Zant*, 3 F.3d 1445, 1453 & n.18 (11th Cir. 1993) (holding that counsel's decision not "to procure expert psychological testimony on the effect that [the defendant's] traumatic upbringing had on his social and emotional development" fell within "the wide range of professionally competent assistance"); *see also Day v.*

*Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").[2] But Calder *cannot* meet this burden by "mere[ly] speculat[ing] that missing witnesses would have been helpful" to his defense. *Cardona v. Dixon*, 2022 WL 2158715, at *13 (S.D. Fla. June 14, 2022) (Altman, J.) (citing *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009)); *see also, e.g.*, *Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016) ("Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with his claims is mere speculation and does not entitle [the petitioner] to habeas relief.").

This legal framework easily disposes of Ground One. Although Calder suggests that "a Ballistic and Blood Splatter expert for the defense would have helped to support the Defendant's defense[,]" Petition at 5, he hasn't identified any "actual testimony by the witness or an affidavit" to support his claim that any such expert actually exists, *Lucas v. Inch*, 2019 WL 5017431, at *13 (S.D. Fla. July 23, 2019) (White, Mag. J.) (quoting *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)), *aff'd*, 842 F. App'x 357 (11th Cir. 2021). Indeed, he hasn't even given us the name of a single ballistic—or blood spatter—expert, much less has he identified one who would've testified in the way he proposes. Just about every defendant can, years after his conviction, speculate about a set of experts (or other witnesses) who, unconstrained by ethical considerations, would testify to everything the defendant wants them to say—and rebut every piece of evidence the government had adduced at trial. But "mere

---

[2] Florida courts likewise deny ineffective-assistance claims premised on counsel's alleged failure to call an expert witness unless the defendant "asserts both the substance of the proposed testimony and that the testimony would have been helpful to [his or her] defense at trial." *Cooper v. State*, 336 So. 3d 415, 417 (Fla. 2d DCA 2022) (citing *State v. Lucas*, 183 So. 3d 1027, 1034 (Fla. 2016)).

speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." *Streeter*, 335 F. App'x at 864.

That's enough to deny Ground One on the merits. We add here only that there's a good reason for Calder's inability to identify an expert who would say that the police moved the victim's body: The *unrebutted* trial testimony, after all, was that law enforcement made sure *not* to move the body. Detective Torok, for instance, testified that "[t]he front door [of the apartment] could not be opened" because the victim's body was lying against it, so he and the other officers could only enter and exit the victim's apartment by climbing a ladder and entering through "a window of the apartment where the incident occurred." Trial Tr. [ECF No. 13-1] at 984–85. This testimony plainly refutes Calder's belief that law enforcement moved the victim's body after she was shot. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) ("A petitioner is not entitled [to relief], however, when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible.").

We therefore **DENY** Ground One.

## II.    Ground Two

Calder alleges in Ground Two that his lawyer "was ineffective for failing to request a hearing on the issue of voluntariness of the Defendant's January 21, 2008 statement, prior to the State Attorney using the Statement for impeachment purposes[.]" Petition at 7. He also says that, during closing arguments, the prosecutor improperly argued "that the Defendant's January 21, 2008 statements were substantive evidence of guilt, and showed premeditation." *Id.* at 8. The State cites *Harris v. New York*, 401 U.S. 222 (1971), for the proposition that "a defendant may be impeached with his own un-Mirandized statement" and urges us to deny Ground Two on that basis. Response at 38.

While we agree with the State that Ground Two fails, we think there's a little more to it than that. It's undisputed that Calder gave the January 21, 2008 Statement in circumstances that violated

his *Miranda* rights. *See Calder*, 133 So. 3d at 1031 ("When, as in this case, an officer persists in asking a suspect whether he wishes to give his 'side of the story' after the suspect has unequivocally invoked his rights, the officer is not asking harmless clarifying questions; he is violating the suspect's rights under *Miranda*."). And the State's right that a defendant who testifies in his own defense may be impeached with his own prior statements—even if those statements were taken in violation of his *Miranda* rights. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("Despite the fact that patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination."). But Calder *isn't* arguing that the prosecutor was wrong to cross him with a statement that violated his *Miranda* rights. He's saying that the circumstances of his police interview rendered his January 21, 2008 Statement *involuntary*. *See* Petition at 7 ("At no time . . . did counsel request a hearing, outside the presence of the jury, on the issue of voluntariness of the Defendant's January 21, 2008 statements."). And an *involuntary* statement—unlike a statement taken in violation of a defendant's *Miranda* rights— *cannot* be used to impeach the defendant's testimony in a criminal case. *See United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005) ("The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial."); *Willacy v. State*, 640 So. 2d 1079, 1083 (Fla. 1994) ("Before the defendant's statement can be admitted for impeachment purposes, the State must, by a preponderance of the evidence, show that the statement was voluntarily made."). Unfortunately, neither the Response nor the State's Postconviction Response (which is the presumptive reasoning of the state court) contemplated this distinction. *See* Response at 34–40; State's Postconviction Response [ECF No. 12-1] at 9–10. We therefore must take the unusual step of reviewing this part of Ground Two *de novo. See Mason*, 605 F.3d at 1119 ("When, however, a claim is properly presented to the state court, but the state court does not adjudicate it on the merits, we review *de novo*.").

Under Florida law, a "state has the burden to show by a preponderance of the evidence that a confession was voluntary." *Roman v. State*, 475 So. 2d 1228, 1232 (Fla. 1985). The state trial court found that the State had met its burden of showing that the January 21, 2008 Statement was *voluntary*—and that the State properly used it to impeach Calder at trial—even though it violated *Miranda*. Here's how the state court articulated its reasoning:

> The Court: Well, my recollection of the caselaw is as follows: Even if it comes back on appeal that [the statement] should not have been admitted because of *Miranda* violations, the statement can still be used for impeachment purposes. . . . And Mr. Calder never alleged that he was physically beaten or something like that. And so, therefore, the statement was admissible for impeachment purposes and that's exactly what the State did.

Motion for New Trial Hr'g Tr. [ECF No. 13-2] at 7–8; *see also Nelson v. State*, 688 So. 2d 971, 973 (Fla. 4th DCA 1997) ("The trial court's finding that the confession was freely and voluntarily given is clothed with a presumption of correctness."). As an initial matter, then, counsel couldn't have been ineffective for failing to argue that the January 21, 2008 Statement was involuntary because the state court came to the opposite conclusion. *See United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013) ("And it goes without saying that counsel is not ineffective for failing to file a meritless suppression motion.").

And, in saying so, the state trial court correctly applied Florida and federal law. A statement isn't involuntary unless "the defendant was coerced by the government into making the statement[.]" *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) (citing *Colorado v. Connelly*, 479 U.S. 157, 163 n.1 (1986)), *abrogated on other grounds by Coleman v. Singletary*, 30 F.3d 1420 (11th Cir. 1994). Coercion typically requires proof that the police "subject[ed] the accused to an exhaustingly long interrogation, [applied] physical force or the threat to do so, or [made] a promise that induces a confession." *Ibid.*; *accord Chavez v. State*, 832 So. 2d 730, 749 (Fla. 2002) ("To establish that a statement is involuntary, there must be a finding of coercive police conduct."). Calder never tells us *why* he thinks the January 21, 2008 Statement was involuntary, *see* Petition at 7–8—which is reason enough to deny

his claim, *see United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

Calder may just believe that a statement is involuntary if it violates a defendant's *Miranda* rights. But that's plainly not the law. In *Willacy v. State*, 640 So. 2d 1079 (Fla. 1994), for instance, the defendant made an inculpatory statement after a police detective improperly "initiated a conversation with Willacy" after Willacy had invoked his *Miranda* rights. *Id.* at 1083. The Florida Supreme Court held that this *Miranda* violation—without evidence of additional coercive conduct—didn't cast doubt on whether "Willacy's statement was voluntarily made." *Ibid.* And, the court went on, "a substantive violation of *Miranda* does not preclude a defendant's voluntary statement from being used for impeachment purposes." *Ibid.* (citing *Oregon v. Haas*, 420 U.S. 714, 722 (1975)). That's precisely what we have here: a defendant who continued to be questioned *after* he'd invoked his *Miranda* rights—but who has pointed to no evidence of any other coercive tactics that might have rendered his statement involuntary. *See Calder*, 133 So. 3d at 1033 (noting only that "the officer's improper comments, after Calder invoked his right to counsel, were designed to induce him to reinitiate the communication without a lawyer," but *never* suggesting that Calder was subjected to any other coercive techniques). Calder's claim that his statement was involuntary—and that the state court thus violated his constitutional rights when it allowed the State to impeach him with it at trial—therefore fails on the merits.

Calder's related argument—that, during closing arguments, the prosecutor turned the January 21, 2008 Statement into "substantive evidence of [Calder's] guilt"—is frivolous. Petition at 8.[3] "[A]nything [a] lawyer[ ] say[s] [during closing arguments] is not evidence and is not binding on [the jury]," so the prosecutor's reference to the statement during closings didn't transform that statement into substantive evidence of anything. *United States v. Maradiaga*, 987 F.3d 1315, 1326 (11th Cir. 2021) (cleaned up); *see also Jenkins v. State*, 189 So. 3d 866, 870 (Fla. 4th DCA 2015) ("[T]he statements of counsel during opening statements and closing arguments are not evidence[.]"). In any event, the prosecutor properly used the January 21, 2008 Statement to cast doubt on Calder's testimony that he had acted in self-defense. *See, e.g.*, Trial Tr. [ECF No. 13-1] at 1341 ("[O]n cross-examination this morning you heard back on January 21, 2008, that the defendant said, they were blocking me from getting inside. Not that he was inside trying to get out. Over and over and over again I had to impeach him this morning that he was trying to get in and they were trying to keep him out."). As the Eleventh Circuit has explained many times: "Juries may appropriately consider a defendant's credibility, so a prosecutor's otherwise proper comment on a defendant's credibility cannot inject harm into the jury's deliberation." *Hammonds v. Comm'r, Ala. Dep't of Corr.*, 712 F. App'x 841, 857 (11th Cir. 2017) (citing *Portuondo v. Agard*, 529 U.S. 61, 67–68 (2000)).

We therefore **DENY** Ground Two.

## III.    Ground Three

Calder argues in Ground Three that counsel was ineffective for "failing to [d]iscover that the January 21, 2008 statement had been tampered with by agents of the State of Florida[.]" Petition at 8.

---

[3] The state court considered—and rejected—this part of Ground Two. *See* State's Postconviction Response [ECF No. 12-1] at 10 ("[T]here was no error in allowing the State to comment on [the January 21, 2008 Statement], and explain that it was impeachment evidence in her closing argument."). We therefore review this part of the claim under AEDPA's rigorous standard of review. *See Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1263 (11th Cir. 2014) ("[I]f a state court has adjudicated the claim on the merits, then a petitioner must satisfy § 2254(d)(1)[.]").

As "evidence" of this alleged tampering, Calder points to the transcript the Lauderhill Police Department prepared, which differs slightly from the transcript the court reporter prepared after Calder's *second* trial had ended. *See id.* at 9 ("After the defendant's second trial conviction, on appeal, the court reporter transcribed the January 21, 2008 statement for purposes of appellate review. Upon review of the two transcripts, the Defendant discovered that the police transcript of Defendant's January 21, 2008 statement had been tampered with."). Calder also notes that certain portions of the Lauderhill Transcript were "blanked out." *Ibid.* This claim is silly.

At his second trial, the prosecutor impeached Calder with the transcript the Lauderhill Police Department had prepared. *See, e.g.*, Trial Tr. [ECF No. 13-1] at 1221 (referring to "Page 5, Lines 202, 203, 204" of the Lauderhill Tr. [ECF No. 11-2] at 2–81). The State *also* introduced this transcript into evidence at Calder's *first trial* as a demonstrative exhibit to help the jury follow along as the January 21, 2008 Statement was played in open court. *See* First Trial Tr. [ECF No. 11-1] at 248 ("The Court: Members of the Jury, you're going to get a transcript . . . . That transcript is to aid you in understanding the actual video tape or the video which is exhibit [46] in evidence."). After the second trial, while Calder's appeal was pending, a court reporter prepared a separate transcript of the January 21, 2008 Statement. *See* Court Reporter Tr. [ECF No. 11-2] at 129–82; *see also* Motion to Supplement the Record [ECF No. 11-2] at 122 ("Appellant again requests that the record be supplemented with Calder's statement given to police on January 21, 2008."). This second transcript starts with a warning from the court reporter: "Whereupon, the following was transcribed from a DVD by Jamie Mackrell, Court Reporter, *to the best of my ability*[.]" Court Reporter Tr. [ECF No. 11-2] at 129 (emphasis added).

For two reasons, the state postconviction court was right to reject this claim. *First*, the "blanks" Calder's complaining about in the Lauderhill Transcript were inserted by the *trial court*—not clandestine agents of the State—to *avoid prejudicing* Calder. Before the transcript could be used as a demonstrative exhibit during Calder's *first* trial—when, remember, the State introduced the January

21, 2008 Statement into evidence—the trial court ordered the State to redact certain irrelevant or prejudicial portions of the statement (and the transcript). *See* First Trial Tr. [ECF No. 11-1] at 249–50 ("[The Court]: So, therefore, in your transcript you're going to see certain spaces, I think it's whited out, it had no relevance, nothing [to] do with this case. . . . I ordered those things to be taken out."). Calder cannot now use these redactions—which were made *for his benefit*—as evidence of a nefarious conspiracy against him.

*Second*, the minor differences between the two transcripts aren't "proof" of anything. Calder is right that the court reporter's transcript "ends at page 54, which is only page 12 of the [Lauderhill Transcript.]" Petition at 10. But that's because the Court Reporter's Transcript includes only part of the full transcript. Remember that the State played the *complete* January 21, 2008 Statement at Calder's first trial. Unfortunately for Calder, the transcript from *that trial* shows that Calder said *everything* the Lauderhill Transcript records him as saying. *Compare* First Trial Tr. [ECF No. 12-7] at 125–217, *with* Lauderhill Transcript [ECF No. 11-2] at 2–81; *cf. Forbes v. Sec'y, Dep't of Corr.*, 2022 WL 17082912, at *12 (S.D. Fla. Nov. 18, 2022) (Altman, J.) ("Looking at other parts of the trial record, in fact, we can see clearly that the jury heard the full recording—and that they were shown the full transcript of that recording as a demonstrative aid—even if the court reporter . . . was only able to understand (and transcribe) some portions of that recording.").[4]

---

[4] Even if there were an error in the transcription, that error would have been harmless. Calder insists that the prosecutor used the tampered-with statement "during closing arguments as substantive evidence of the Defendant's guilt." Petition at 10. But, as we've explained, the State did no such thing. The State properly used the transcript to impeach Calder with his prior inconsistent statements. *Cf. McGriff v. Dep't of Corr.*, 338 F.3d 1231, 1236 (11th Cir. 2003) ("[S]tatements obtained in violation of a defendant's Fifth or Sixth Amendment right to counsel cannot be used in the prosecution's case-in-chief against the defendant, but may be used for impeachment purposes." (citing *Harris*, 401 U.S. at 225–26)). In any event, the State never introduced the transcript itself into evidence, so there's no reason to believe that its limited use as a demonstrative aid had a "'substantial and injurious effect or influence' on the jury's verdict." *Mansfield*, 679 F.3d at 1307 (quoting *Brecht*, 507 U.S. at 637).

Since we have no reason to believe that the Lauderhill Transcript was in any way tampered with, Ground Three is **DENIED**.

## IV.    Ground Four

In Ground Four, Calder claims that his trial counsel was ineffective for failing to impeach a witness, Michael Green, with two prior inconsistent statements Green had made about the shooting. According to Calder, during a prior deposition, Mr. Green had testified that the victim "threw liquid from a vase at Defendant's face," and that a third person, Patrick Johnson, was "pulling" Calder outside. Petition at 11–12. These details are important, Calder explains, because his self-defense claim relied on his testimony that the victim had blinded him with a liquid and that Patrick Johnson was "attacking" him from behind. *See id.* at 11 ("The Defendant's theory of defense was that while he was attempting to go retrieve the rest of his clothes, . . . he was attacked by [the victim] whom [sic] threw liquid from a vase at Defendant's face, which blinded the Defendant, and that Michael Green and Patrick Johnson started to attack him as well, causing the Defendant to fear for his life and fire a shot from the gun."). In the State's view, "Michael Green's statements at this deposition, at the first trial, and then at retrial, were substantially similar," so there were no "prior inconsistent statements" for Mr. Green to be impeached with. Response at 44.

"The decision as to whether to cross-examine a witness is 'a tactical one well within the discretion of a defense attorney.'" *Fugate*, 261 F.3d at 1219 (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). How and when a defense attorney decides to cross-examine a witness "is one of the most important tactical decisions a lawyer will make during a trial—so, absent egregious error, we generally defer to the lawyer's professional, in-court judgment." *Wilkins v. United States*, 2023 WL 4509735, at *22 (S.D. Fla. July 13, 2023) (Altman, J.) (citing *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1239 (11th Cir. 2011)). Naturally, an attorney's impeachment cannot be ineffective if there's nothing to impeach the witness with. *See Lindsey v. Smith*, 820 F.2d 1137, 1152 (11th Cir. 1987) ("A

habeas petitioner who proposes alternative trial strategy that would itself have proved futile has failed to demonstrate that the representation at trial fell below an objective standard of reasonableness."). Under Florida law, a prior statement is "inconsistent" when it "directly contradict[s], or [is] materially different from, the testimony offered at trial." *Woods v. State*, 92 So. 3d 890, 892 (Fla. 4th DCA 2012) (citing *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004)).

The state postconviction court reasonably denied this claim because Mr. Green's prior statements about the liquid the victim threw at Calder's face—and about the extent to which Patrick Johnson was "pulling" Calder from behind—were mostly *consistent* with Green's testimony at trial. During his deposition, Green agreed that the victim had thrown liquid in Calder's face. *See* Green Deposition [ECF No. 12-6] at 239 ("Then I saw [the victim] pick up a liquid something. She pick up a bottle of liquid and flinged it in his face." (errors in original)). Green also said that he and the victim were trying to push Calder out of the apartment while Patrick Johnson was pulling Calder from behind—also trying to get him out of the apartment. *See id.* at 240–41 ("[Green:] After [the victim] splashed something in [Calder's] face next thing I know he was like someone pulling him, pulling outside and she got behind the door, behind the door right there and push him out. . . . [Defense Counsel]: Patrick pulled him out? A: Yes."). Green then repeated *most* of this testimony at trial:

> [Defense Counsel]: Okay. And when you saw this, that is when [the victim] picked up something liquid?
>
> [Green]: Yes.
>
> [. . . .]
>
> Q: But you do know that it hit Winston in the face; is that right?
>
> A: Yes.
>
> Q: Did he put his hands to his face?
>
> A: Don't remember.
>
> Q: You said at this point she was pushing Winston out the door?

A: Yes.

Q: And Patrick was pulling him out the door; is that right?

A: I don't know because I can't see Patrick because he was outside.

Trial Tr. [ECF No. 13-1] at 805–06.

Since Green testified—both at his deposition and at trial—that the victim threw liquid in Calder's face, Calder's claim that this aspect of Green's trial testimony was inconsistent with his deposition is flatly refuted by the record. On the other hand, Green's trial testimony about Patrick Johnson *did* differ from what he'd said at his deposition. Green originally said that Johnson was "pulling" Calder out, but then testified at trial that he didn't "know" what Patrick was doing. But this marginal change in Green's testimony didn't "contradict" or "materially differ[ ]" from his prior statement, *see Woods*, 92 So. 3d at 892, because Green still agreed that Johnson was right outside the apartment when he and the victim were trying to push Calder out, *see* Trial Tr. [ECF No. 13-1] at 762 ("[The Prosecutor]: Is Patrick Johnson anywhere near this situation when it's happening[?] [Green]: He was outside. Q: So he's on the other side of the door? A: Yes."). The point Calder was trying to make at trial was that he was fighting off the victim, Green, and Johnson when he shot the victim in self-defense. Green admitted at trial that he and the victim were fighting Calder just before the victim was shot—and he admitted that Johnson was just behind Calder on the other side of the door. That Green didn't *also* say that Johnson was pulling Calder out the door doesn't materially advance Calder's self-defense claim. *See Smith v. Sec'y, Dep't of Corr.*, 2020 WL 1451680, at *16 (M.D. Fla. Mar. 25, 2020) (Honeywell, J.) ("Counsel's failure to highlight minor inconsistencies on largely immaterial matters was not ineffective assistance of counsel."). This is especially true because (as we've said) Green *admitted* at trial the most important part of Calder's self-defense claim—which is that the victim had thrown a liquid at Calder's face just before Calder shot her.

24

In any event, there's no "reasonable probability that . . . the result of the proceeding would have been different" if Calder's lawyer had pressed Green on this (very) minor inconsistency. *Porter*, 558 U.S. at 40. Two separate witnesses (Green and Patrick Johnson) confirmed that, contra Calder's self-defense claim, *he* was the aggressor—and that *he* had attacked the victim before he shot her. *See* Trial Tr. [ECF No. 13-1] at 758 ("[Green]: After [Calder] pushed her and hit her head to the wall [the victim] have a cut [sic] and her glasses fell off."); *id.* at 836 ("[Johnson]: Calder pass the people in the front, go inside the house. As he reach in, [the victim] was in the living room there. So right away he started to fight her. I don't remember if he box her or if he tump her.").[5] And the jury evidently believed these witnesses. As if that weren't enough, when Calder took the stand, the State impeached him with his own prior statement, in which he had *admitted* that he'd forced his way into the apartment because the victim wasn't letting him in. *See id.* at 1249 ("[The Prosecutor]: [Y]ou were trying to force your way back into the apartment, correct? . . . [Calder]: No, not force. I was trying to get in, not force. Q: Would you agree with me, Mr. Calder, that you were asked the question: 'Q: Why do you think she started to kick you? A: Because me force to come in her, me try to force to go through the door.' You used the word force two times. A: I was giving the police a scenario what happened." (errors in original)). Given all this evidence, Calder has failed to show that his lawyer's decision not to impeach Green on this minor inconsistency would've had any effect on the jury's verdict. *See Thomas v. United States*, 596 F. App'x 808, 810 (11th Cir. 2015) ("Thomas did not demonstrate that his defense was prejudiced by [counsel's] failure because the government presented strong evidence of his guilt." (citing *Strickland*, 466 U.S. at 694)).

Ground Four, in sum, is **DENIED**.

---

[5] Johnson explained that both "box" and "tump" mean hitting someone—although "boxing" is hitting someone with an open palm. Trial Tr. [ECF No. 13-1] at 837–38.

V.       **Ground Five**

Calder alleges in Ground Five that the prosecutor "repeatedly lied to the jury" during her closing arguments and that defense counsel should have objected to this "prosecutorial misconduct." Petition at 15. Calder specifically accuses the prosecutor of telling "the jury that no liquid had been thrown on Defendant's face," even though Green admitted that the victim had thrown liquid in Calder's face. *Ibid.* This, again, is frivolous.

In closing arguments, prosecutors may draw "inferences fairly suggested by the evidence or by matters of common knowledge outside the evidence." *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). But they cannot "materially misstate the facts shown by the evidence[.]" *United States v. Goldstein*, 989 F.3d 1178, 1199 (11th Cir. 2021). The prosecutor didn't misstate any facts here. On the contrary, the prosecutor relied on Calder's prior inconsistent statements to present a reasonable interpretation of the evidence. Calder's theory of defense was that "the liquid had blinded him" and that he fired his gun out of desperation and without fully knowing where he was aiming. Petition at 15; *see also* Trial Tr. [ECF No. 13-1] at 1350 ("[Calder told you] that he was blinded by this liquid. . . . [He] shot, not knowing where he was shooting because he was blinded by this liquid."). The prosecutor cast doubt on Calder's story by juxtaposing his trial testimony with the January 21, 2008 Statement, in which Calder had denied that the liquid had blinded him. *See* Trial Tr. [ECF No. 13-1] at 1351 ("[Calder] was asked not once, but twice, 'Was there liquid thrown in your face?' And he said, 'No, no liquid. No liquid.'"); *id.* at 1395 ("He was very clear in his statement about why he pulled the gun, because [he was hit] in the face. . . . Not, I pulled the gun, I aimed the gun and I shot the gun because I was blinded with chemicals in my eyes."). It's one thing to say that Calder was hit in the face by an object—of that there's no dispute. It's quite another, though, to say that he was *blinded* by it. And it's this latter claim that the prosecutor attacked in her closing argument—and not without reason: As we've shown, Calder *himself* had previously said that, although he was hit in the face, he wasn't

*blinded* when he fired. *See id.* at 1260 ("Q: So would you agree with me . . . that you were asked 'Do you know what it was they threw at you?' Answer from you, 'It wasn't liquid.' . . . And you go on to describe, you think it was a small vase with no liquid. [Calder]: At that time. At that time."); *see also* Lauderhill Transcript [ECF No. 11-2] at 41 (same). That's enough to render the prosecutor's statement wholly proper. *See United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014) ("[A]lthough a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence.").

In any event, there's no "reasonable probability" that the prosecutor's comments had any effect on the trial because the state court instructed the jury that the prosecutor's arguments weren't evidence. *See* Trial Tr. [ECF No. 13-1] at 1336 ("[The Court:] As I said earlier, you don't need to take notes because what the lawyers say is not evidence."). And we assume that the jurors heeded this instruction. *See Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983) ("A jury is presumed to follow jury instructions."); *Sutton v. State*, 718 So. 2d 215, 216 n.1 (Fla. 1st DCA 1998) ("The law presumes that the jury followed the trial judge's instructions in the absence of evidence to the contrary.").

Remember, too, that a defense lawyer doesn't perform ineffectively unless "no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. But many lawyers take the commonsense view that objections during closing arguments aren't worth the squeeze. *See, e.g., Ether v. Dixon*, 2022 WL 1908918, at *22 (S.D. Fla. June 3, 2022) (Altman, J.) ("Even if the prosecutor's statement had been improper, a good lawyer might justifiably suppose that there's little to be gained from objecting. . . . [A] seasoned lawyer might forego the objection . . . in order to avoid the dual implication that the State was onto something and that, whatever that harmful thing was, Ether was trying to hide it." (first citing *Brewster v. Hetzel*, 913 F.3d 1042, 1057 (11th Cir. 2019); and then citing *Brown v. Dixon*, 591 F. Supp. 3d 1251, 1279 (S.D. Fla. 2022) (Altman, J.))). For one

thing, any such objection would only highlight for the jury the defense lawyer's view that the prosecutor had just said something damaging. For another, the trial judge's most likely response to a closing-argument objection would be to remind the jurors that the lawyer's comments aren't evidence—not exactly a ringing endorsement of the objection's merits. For all these reasons, we don't think Calder's trial counsel can be faulted for failing to object to this statement in closing argument.

Ground Five is therefore **DENIED**.

### VI.    Ground Six

In Ground Six, Calder castigates his lawyer for failing to notice that a juror "was sleeping throughout a span of approximately 5-7 minutes." Petition at 17. Calder also alleges that, when the sleeping juror was brought to his lawyer's attention, she refused to ask the trial court to remove the juror. *Ibid.* In the State's view, the "Petitioner [failed] to establish that the unspecified juror was sleeping during critical portions of his trial." Response at 56. We agree.

Under Florida law, a lawyer may be ineffective for failing to object when he or she becomes aware of a sleeping juror. *See Judd v. State*, 951 So. 2d 103, 104 (Fla. 4th DCA 2007) (finding ineffective-assistance claim sufficient where "appellant alleged that a specific juror was sleeping during his trial, that he informed his trial counsel of the sleeping juror, and that his counsel failed to bring this information to the attention of the court"). But Calder must show *both* "that a juror was asleep during crucial testimony" *and* that counsel knew about it. *Everett v. State*, 111 So. 3d 202, 203 (Fla. 5th DCA 2013); *see also Harper v. Florida*, 2018 WL 11207218, at *11 (S.D. Fla. Apr. 6, 2018) (White, Mag. J.) ("Under Florida law, in order to be granted relief on the matter of a sleeping juror, petitioner must show that the juror was sleeping, counsel knew about the problem, counsel failed to act on the problem, and petitioner was prejudiced by the inaction of counsel."), *report and recommendation adopted*, 2019 WL 10744942 (S.D. Fla. Feb. 4, 2019) (Lenard, J.).

But Calder tells us almost nothing about this "sleeping juror": He doesn't tell us which juror it was, and he doesn't try to identify the *specific* parts of the trial the juror (allegedly) slept through. What's worse, he doesn't tell us *when* exactly he notified his lawyer about the sleeping juror—and he never says that the juror continued to sleep *after* his lawyer found out about it. Most importantly, there's no other evidence in the record to substantiate Calder's claim. *See* Response at 56–57 ("Other than the Petitioner's unsubstantiated allegations here and in the state forum, no showing has been made that a juror (Petitioner fails to specify which one) was nodding off . . . Petitioner [also] fails to allege which portion of the testimony the unnamed juror may have missed.").

The state postconviction court thus reasonably concluded that there was no record evidence of a sleeping juror. *See* State's Postconviction Response [ECF No. 12-1] at 20 ("The Defendant fails to specify who the alleged sleeping juror was, what the alleged missed testimony was and provides no record evidence to support his claim."); *see also, e.g., Mackey v. Sec'y, Dep't of Corr.*, 2017 WL 4003758, at *6 (M.D. Fla. Sept. 12, 2017) (Honeywell, J.) ("Furthermore, the record does not reveal whether the juror merely appeared to be sleeping, or, if he was in fact asleep, or, how long he slept. . . . Accordingly, Mackey has not shown that the state court . . . unreasonably determined the facts in rejecting this claim.").[6] Under AEDPA, "a determination of a factual issue made by a State court *shall be presumed to be correct*." 28 U.S.C. § 2254(e)(1) (emphasis added). Calder can only "rebut[ ] th[is] presumption of correctness" by adducing "clear and convincing evidence" that the state postconviction court got it wrong. *Ibid.*; *see also Pye*, 50 F.4th at 1035 ("[A] state court's factual determinations are 'presumed to

---

[6] True, the state postconviction court didn't hold an evidentiary hearing on this claim. And Florida courts generally disfavor the summary denial of "sleeping juror" claims. *See McGraw v. State*, 796 So. 2d 1205, 1206 (Fla. 4th DCA 2001) ("It is usually improper to summarily deny a claim that counsel failed to act upon being informed that a juror was sleeping during trial."). But "it is beyond debate that a state court's failure to conduct an evidentiary hearing on a post-conviction motion does not constitute a cognizable claim for habeas relief." *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009) (quotation marks omitted). And, for all the reasons we've identified, Calder's federal sleeping-juror claim plainly fails on the merits.

be correct,' and the petitioner has the burden of proving otherwise 'by clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1)). "Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt. Indeed, . . . review of findings of fact by the state court under § 2254(e)(1) is even more deferential than under a clearly erroneous standard of review." *Mansfield*, 679 F.3d at 1309; *see also Turner v. Crosby*, 339 F.3d 1247, 1273 (11th Cir. 2003) ("[T]he state court's findings of fact are entitled to a presumption of correctness and may be ignored only if the petitioner shows by clear and convincing evidence that the state court's determination was not fairly supported by the record. . . . This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record.").

Since Calder hasn't produced *any* evidence—much less clear and convincing evidence—for his sleeping-juror claim, we **DENY** Ground Six.

## VII. Ground Seven

Calder avers in Ground Seven that defense counsel was ineffective "for failing to argue in closing arguments that State witness Patrick Johnson testified that he witnessed the Defendant go leave the bag at the truck and seen [sic] the Defendant return right back to the house[.]" Petition at 18. This testimony was important to his defense, Calder explains, because it "clearly proved that the Defendant had not gone to the vacant apartment to get the gun" and refuted the State's argument that he committed premeditated murder. *Id.* at 19.

Here, again, the record belies Calder's claim. Calder's lawyer *extensively* highlighted Patrick Johnson's testimony during her closing arguments and *explicitly* argued that "there is no testimony that [Calder] went down to an apartment and picked a gun up out of there." Trial Tr. [ECF No. 13-1] at 1370. Here's how counsel framed this part of her argument:

Then we have [Calder] leaving and taking the suitcase to his truck—Patrick Johnson's truck. Patrick Johnson is telling you that he's standing at the doorway. Okay? . . . . What did Patrick Johnson tell you? He went to his truck. *I would hotly contest this whole idea suddenly today that [Calder] went down to the apartment to pick this gun up.* Okay?

[. . . .]

Patrick Johnson told you [Calder] went to the truck, he brought his suitcase in there. There is absolutely no testimony before you—and please do not let this get confused. *There is no testimony that he went down to an apartment and picked a gun up out of there.*

*Id.* at 1369–70 (emphasis added). Since the record conclusively refutes Calder's claim that counsel didn't address Patrick Johnson's testimony during her closing arguments, we **DENY** Ground Seven.

## VIII.   Ground Eight

Finally, in Ground Eight, Calder says that his lawyer should have introduced evidence that the victim had a "prior arrest record of [d]omestic violence." Petition at 21. According to Calder, this arrest would have shown that the victim "had violent tendencies" and would've supported Calder's "self-defense [claim] about being attacked by [the victim]." *Ibid.*

But the state postconviction court denied this claim because the victim's prior arrest wouldn't have been admissible under Florida law. *See* State's Postconviction Response [ECF No. 12-1] at 22 ("[S]pecific acts of aggression and violence by the victim are inadmissible to prove that the victim was the aggressor and that the defendant acted in self-defense." (quoting CHARLES W. ERHARDT, FLORIDA EVIDENCE § 405.3 (2012 ed.))). We cannot second-guess the state court's interpretation of state law. *See McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992) ("A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of constitutional nature is involved."). And (it goes without saying) a defense lawyer cannot be ineffective for failing to (try to) introduce inadmissible evidence. *See Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1362 (11th Cir. 2020) (holding that counsel wasn't ineffective "in failing to try to introduce inadmissible polygraph evidence").

31

Calder's claim that the victim had a prior arrest is also pure speculation. He doesn't tell us when or where this arrest occurred, and he doesn't give us a case number or other record by which we might find this arrest. *See* Petition at 21; Amended Postconviction Motion [ECF No. 11-3] at 262–64. A lawyer cannot be ineffective for failing to track down an arrest that may never have happened. *See, e.g., Giardina v. Sec'y, Dep't of Corr.*, 2019 WL 5213331, at *13 (M.D. Fla. Oct. 16, 2019) (Scriven, J.) (denying an ineffective-assistance claim where "Giardina did not specifically identify or provide evidence of [the victim's] prior conviction"); *see also Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.").

Ground Eight is therefore **DENIED**.

## EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). Based on what we've said—including and especially the presence of a robust trial and state-postconviction record—we don't think we'd benefit from any further factual development.

## CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural

ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). Jurists of reason wouldn't debate our assessment of Calder's constitutional claims, so we'll **DENY** any request for a COA.

*     *     *

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Petition [ECF No. 1] is **DENIED**, that any demand for a COA is **DENIED**, that any request for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on December 18, 2023.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record
        Winston Calder, *pro se*